As the government recognizes in its opposition brief, the immigration judge questioned parts of Ms. Zahatye's testimony but made no adverse credibility determination. Consequently in deciding this petition, the court must accept Ms. Zahatye's testimony that she fled Eritrea in 1999 after having been called for national service, which according to the State Department, this is on page 274. She wasn't actually called. She was told she would be called. Is that right? Well, actually in her testimony, Your Honor, she said that they actually came to her home to get her and said that they were coming back. And yes, her name was listed in the local sort of government headquarters there as somebody who was to be recruited. Counsel, even if we accept that testimony, is that sufficient to demonstrate the persecution under controlling case law? Well, I think the strength of this case, Your Honor, is the well-funded fear of future persecution claim. I think if you accept her testimony that she fled Eritrea because she didn't want to perform this military service, this national service, and you consider the government's own evidence, the country conditions, I think that really does compel the conclusion that there's at least a reasonable possibility that she's going to suffer persecution on a country level. But how do you get there if, I mean, if forced conscription does not constitute persecution, and we've held that in the Ninth Circuit, how do you get there? I mean, obviously... I think the evidence submitted by the government establishes, I think pretty conclusively, two points. I mean, first, it does establish that draft evaders generally are subject to various forms of mistreatment that rise to the level of persecution. But more importantly, for your question, the unaccounted question, it establishes that not all draft evaders are treated alike, and that Jehovah's Witnesses are, quote, singled out, according to the State Department, for harsher treatment. Those two things, it seems to me, establish that her fear is at least in part on account of her religious faith. Well, I guess I'm struggling with the fact, you know, obviously, I mean, in our history, people went to Canada because they didn't want to go to prison for not being drafted. How, you know, if another country says you have to go in the military and you're there, you know, how do we, you know, and obviously, putting people in prison, if they don't belong in prison, you could say that that was persecution, but if they have, but if that's one of the requirements of being there, you know, how do we get there without... The problem with that analysis, Your Honor, is that she's not simply afraid of being sent to jail for the three-year period. The problem is that Jehovah's Witnesses are not treated the same as other draft evaders. They're treated more harshly, and the State Department makes that clear. What exactly are you relying on? There's a couple sentences in the Religious Freedom Report. Is that what it is? Well, yes. On page 273 of the Religious Freedom Report, the State Department says that Jehovah's Witnesses are not necessarily referring to persons who have fled national service, but it says that are singled out for harsher treatment than that received by members of other faiths for committing similar acts. This is on page 273 of the record. Then it provides some specific examples of just how Jehovah's Witnesses are singled out for harsher treatment. On 277 of the record, it says that the Penal Code in Eritrea says that detainees may be held for a maximum of just 30 days without being charged for a crime. And it goes on to say that the maximum penalty for refusing to perform national service is three years imprisonment. But the 2003 country report says that there are some Jehovah's Witnesses, it's a small number in that report, who are accused of failing to perform national service and had been held without charge and without being tried for as much as five years. That's two years longer than the maximum sentence. This is what my issue in the case. Whether one thinks that would be enough for a well-founded fear or not, the I.J. didn't recognize this. Is that right? I mean, he seemed to say the opposite in his opinion. Yeah, he did. And so, questions, what do we do with that? I mean, do we have any case law that says if there's a factual error, well, the one that might not matter, but just a factual error in the I.J. report, he says the country report says X, it really says Y. Is that enough basis for reversal? That's an interesting question. In our view, you can vacate a board decision and remand even where the evidence isn't so compelling as to allow you to reverse. And there's some good Second Circuit law on that point. I think there's a- Is there a Ninth Circuit law on that? There is an interesting decision that comes to mind from Judge O'Scanlan, where I can't think of the name right off the top of my head, but I can provide this to the court, where the immigration judge had misread a State Department advisory opinion. And that had factored into his analysis. And the panel, in an opinion authored by Judge O'Scanlan, said that because the judge had relied to some extent on that factual error, misreading- What did he say? Did they say it was a legal error or a factual error? A factual error. That's what was interesting about that case. But I can provide that to the court. I'll submit a 20-page letter on it. But in this case, what's the evidence in the record that the misstatement was relied upon by the IJ? Well, the immigration judge seemed to be suggesting that the Eritrean authorities weren't detaining Jehovah's Witnesses simply for being Jehovah's Witnesses. And that's true. But the point of the matter here is that we don't have to establish that the sole basis for any harm that Ms. Zahatiye is going to suffer is her religion. We just have to show that it's- Right, but my question to you was, what evidence is there in the record that the factual misstatement contributed to the decision of the immigration judge? Well, in terms of the evidence in the record, our view is that the evidence overwhelmingly establishes that draft evaders are subject to physical harm. I mean, on that point- Okay, my question to you, though, was, you cited us to a case that Judge Scanlon authored where the pivotal point was the IJ relied on the erroneous fact. And so I'm asking you, what evidence is there in the record that this IJ relied on the erroneous fact? Let me just take a look at his opinion here. Because I think it's on page 113 where he makes that- Essentially, he says he recognizes that the argument was that they were discriminated against because of their religion. And then he says that the Ministry of Justice of Eritrea has denied that members of Jehovah's Witnesses were in detention without charges. Although, and it's important, therefore, that Respondent provide convincing evidence for religious affiliation, which is sort of an unsacred. It's hard to figure out what that has to do with the sentence before it. Yeah. I mean, that's as close as I can come to pointing out a factual error by the judge. I mean, in my view, the better course in this particular case, I really think the evidence compels reversal. And I just want to run through that real quickly while I have these remaining two minutes. Because, I mean, first, the country report says that the military police are deployed throughout the country to find deserters and draft evaders. And this is on page 279 of the administrative record. State Department goes on to say, and this is also on page 279, that the military police carry out frequent document checks using roadblocks, street sweeps, house to house searches. They routinely detain persons of military age who have not done their national service. But why is that not just dissidents generally, people that are against the war? What's specific about that as to Jehovah's Witnesses? Well, my point is twofold, Your Honor. I mean, first, we have to accept the fact, because the State Department is crystal clear about this, that draft evaders generally are subject to forms of harm that rise to the level of persecution. And we're not talking about just prosecution here. The law allows for a three-year sentence. But what's happening in Eritrea is they're beating these people. The State Department says they're severely beating them at times. They're putting them out in the sun for what the Department of State says are prolonged periods of time in temperatures of up to 113 degrees. They're tying their arms and legs and leaving them in those positions for extended periods of time. So draft evaders generally are at risk. But what the State Department goes on to say is that Jehovah's Witnesses are even at greater risk, because they say that they're singled out for more harsh treatment. And it's the combination of two things that makes this case, I think, a winning case. I generally agree with the proposition you're stating. As a general rule, if somebody is merely facing punishment under a generally applicable statute for failing to serve in the military, that's not persecution. If you're going to be prosecuted in jail under the law of that country. But if you're singled out for more harsh treatment because of your religious faith, well, that can be certainly persecution on account of. And the question here, it's undisputed that Jehovah's Witnesses are singled out. The question is, are they going to suffer some harm or suffering that rises to the level of persecution? Well, but I guess if what you're saying that the persecution that generally people suffer, then everyone from that country, we could come here and not be returned to do their military. No, because you'd have to show that there's some, you're at risk of some disproportionate punishment. And I think the record in this case establishes that because there are certain things that only Jehovah's Witnesses are, are, are subject. But the way that you describe the other people being put out in the sun and being this, that, and the other, it would seem that any public dissident, why wouldn't, you know, why wouldn't they qualify? I don't think the State Department is saying that everybody who evades the draft is going to be subject to those various forms of mistreatment. It's a risk that generally those draft deserters may, may run. But Jehovah's Witnesses run a greater risk. The State Department says they're specifically singled out for those harsher forms of mistreatment. And that's what makes this case unaccountable. Thank you, Your Honor. May it please the Court, good morning. My name is Timothy Walthall. I'm representing the United States. In this case, the, Ms. Zahate fled from Eritrea in 1999 and spent three years abroad, gainfully employed at part, part of the time, before becoming, before coming to the United States. Despite her allegations of dire circumstances, she was able to raise $4,000, get on a plane without credentials, change planes in Europe, fly to the United States, meet the sister of the person who, of the man she ultimately married. What's the relevance of any of this? Do you agree that there was no credibility finding, adverse credibility finding? There was no adverse credibility finding, Your Honor. And I don't believe that we agree with Mr. Jobe's statement that there was no adverse credibility finding. The, with respect to adverse credibility findings, the obligation of the Board is still to go on to determine whether the facts are sufficient. And I think that was established through the – I'm just questioning the particular facts that you're relying on, which don't seem to have anything to do with the actual persecution question. The only thing they could be relevant to is a credibility finding. I think that what we – the reason I bring it up, Your Honor, is because we're not – we're not dealing with a person here who, it seems to me, fleeing from persecution,     I don't think that that's the case. I don't think that that's the case. to come to the United States to change her life, and the asylum provisions of the immigration laws in this country are not the proper vehicle for that. With respect to – Well, I want to just respond to what Mr. Jobe says. He says that because she's Jehovah's Witness, that he, you know, he basically – he may not agree, but on my mind, he's saying, well, just the conscription is not sufficient. But he's saying because she's Jehovah's Witness, she's going to be subjected to more severe punishment than the average person that doesn't want to go in the military. And I think that – let's focus again on what Judge Simpson found at the immigration judge's level. He first found that she needed to be – obviously, the forced conscription, I think, was pretty much established in the Ninth Circuit, must be shown to be politically motivated. I think the evidence with respect to more harsh treatment does not rise to the level of disproportionately severe punishment. I think when you're – But there is a statement in the record by the United States government, as I understand it, that says approximately four Jehovah's Witnesses remained in detention without charge for failing to participate in national service. Some have been detained more than five years without charge. And the IJ just simply does not recognize that evidence. He relies on something else, which is the fact that the Eritrean government says it isn't doing this, but the American government says it is. I think that what the IJ did in this case was looked at the whole record, Your Honor. He cited to a series of information at page 116 of his – of the record. He found that the conflict between Eritrea and Ethiopia was not as drastic as it had been when Petitioner had left, that the report – that there was a report of reduction in societal hostility, that there were no indications that persons are detained in Eritrea solely for religious reasons. That's at AR 113. This is also in the Human Rights Report on Religious Freedom. The Human Rights Report also indicates that Jehovah's Witnesses who performed national service were not subject to discrimination. And I think that's an important piece of evidence in the record, because it goes to the fact that the reason for the harassment is not religiously related, but, in fact, it is designed to make people do their military service. But the one piece of the thing that he doesn't mention is the one most relevant piece, the part I just read here, which instead of mentioning that, he says, the Ministry of Justice of Eritrea has denied that members of Jehovah's Witnesses were in detention without charges, although they acknowledge that some members were in jail serving sentences. So basically, he's believing the government of Eritrea over the government of the United States on that point. I mean, that's what he's doing. I think that the – with respect to the – with respect to the harsher treatment and with respect to that and the country – the country report, I think that the judge is entitled to look at the entire – the entire record, not just that portion. I think that the important piece here is the government of Eritrea. But he didn't look at them. This is what's troubling me. If he had said, I understand that the government report says X, but there's other things that says Y, and I choose to believe Y. But he didn't acknowledge that the government report says X. He did not, Your Honor, but I think that he focused on other aspects of the case, which I – which is the fact that in this case, there's no showing of individualized persecution. These country reports are all well and good, but in this case, there's no – there's no showing that Ms. Zahate was ever physically abused, for one thing. She was – she was never even searched or detained. In her case, her – she makes references to things that happened to her father and her father's business, and – but she does not draw the connection between – on account of the religious nature. Her testimony – the I.J. found that her testimony on this was – was not – did not rise to the level of showing that it was persecution against her. Mr. Job is basically not relying on past persecution at this point, although his brief does to some minor degree. All right. So let's assume we're not talking about that. With respect to the – to the – the prospect of future persecution, I think that the – that the court needs to recognize that the petitioner now is 32 years old, has been in the United States for five years while her parents have remained in Eritrea, and she's – she's – the likelihood is that she's – Well, her parents aren't similarly situated, because they're not facing forced conscription. So can you compare the two in terms of whether or not there's a reasonable fear of future – I think what the I.J.'s finding was, Your Honor, was that – that it's – the reasonable likelihood is that she will not be either upon her return. And I think that his – at the Administrative Record 116, he – he talks about the – several of the – the facts that he relies upon from the – from the country reports, and also the fact that – that she was not subjected directly to conscription, as Judge – Judge Berzin pointed out. She was never directly confronted. She just – her name became on the list at the Kibele at Asmara. Well, even on that, it's not really – what troubles me is that – I mean, this is probably a case in which an I.J. could have written a very convincing opinion. But this one, coming to this conclusion, the opinion is sort of snide, it's inaccurate, it's – it just is not the sort of thing that gives one confidence. And on that point in particular, he says that she was only on a list. And as Mr. Joe points out, and the record does say this, she said that – that they came to the door and said that she was going to be conscripted. She didn't say she was only on a list. So he's not accurate. And the question is, what do we do with that? I think that there are, in the totality of the record, in addition to some of the things that the I.J. relied upon, I think in terms of the threat now. I think the judge was focused on some of these things at AR-116. He was focusing on the way the conditions are now and the likelihood of her going back and being subjected to military conscription. I think another important point that we – that the United States would like to point out is that this issue was not really raised front and center at the I.J. level. Petitioner didn't raise severe economic hardship or disproportionate punishment. And I think that under the Tejada-Mehta decision and subsequent ones, Petitioner failed to exhaust her administrative remedies, and it precludes the Court from having jurisdiction over this – over reviewing those with respect to that. But I think that the Court may still reach, from a totality of the record, a – that is supported by substantial evidence and certainly does not rise to the level that it compels the Court to reverse the I.J.'s decision in this matter. And with respect to – I think with both respect to economic harm and disproportionately severe punishment, the Petitioner has failed to individualize her persecution. A lot of the things she talks about in economic harm were – happened to persons other than her. She never had a job, never lost a job, never indicates that she even applied for a job while in Eritrea. And I think that the judge is entitled, even without a credibility – adverse credibility finding, to take the totality of the conflicting evidence and come and arrive at a decision that would withstand reversal by this Court. Thank you very much.
judges: Berzon, Rawlinson, Callahan